STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 04-1500


JANIS SQUARE

VERSUS

MARJORIE LEBLANC, ET AL.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2001-0051-K
HONORABLE PATRICK LOUIS MICHOT, DISTRICT JUDGE

**********

BILLY HOWARD EZELL
JUDGE

**********

Court composed of Glenn B. Gremillion, Billy Howard Ezell, and James T. Genovese, Judges.

AFFIRMED.


Robert Ray Broussard
Craig Wesley Marks
Attorneys at Law
P. O. Drawer 80827
Lafayette, LA 70598-0827
(337) 232-3333
Counsel for Plaintiff/Appellant:
Janis Square

**Thomas Reginald Hightower, Jr.**
**Patrick Wade Kee**
**P. O. Drawer 51288**
**Lafayette, LA 70505**
**(337) 233-0555**
**Counsel for Defendants/Appellees:**
**Shelter Insurance Company**
**Marjorie LeBlanc**
**GJL Investment Company**

**James D. Thomas, II**
**Wall, Thomas, Riche & Wall**
**P. O. Box 65168**
**Baton Rouge, LA 70896**
**(225) 928-0430**
**Counsel for Defendant/Appellee:**
**Randall D. Lea,  M.D.**

**Kevin Paul Tauzin**
**Dozier & Tauzin**
**2901 Johnston Street, Suite 300**
**Lafayette, LA 70503**
**(337) 291-9292**
**Counsel for Intervenors/Appellees:**
**Kevin Paul Tauzin**
**Dozier & Tauzin**

**EZELL, JUDGE**.

Janis Square appeals a jury verdict awarding her $19,000 for an automobile accident. Asserting several legal errors, Square claims that her damages should be increased or, in the alternative, Square claims the jury verdict should be reversed and the case remanded to the trial court for a new trial.

## FACTS

On January 7, 2000, Square was stopped at a red light in the City of Lafayette at the intersection of Cameron Street and West University Avenue. Directly behind her was a vehicle driven by Majorie LeBlanc. LeBlanc explained that her foot slipped off the brake and she ran into Square's vehicle.

Corporal Don Thibodeaux, a police officer with the City of Lafayette Police Department, investigated the accident. He happened to be in the unique position of having his vehicle positioned behind LeBlanc's vehicle, also stopped for the red light when the accident occurred. He testified that LeBlanc was stopped before the accident, LeBlanc's vehicle seemed to move forward, and he heard no audible evidence of a collision.

Prior to this accident, Square had been involved in another accident on January 29, 1999, in which she was also rear-ended. She suffered a herniated disc in her neck which required surgery in August 1999. Her surgery was performed by Dr. Luiz de Araujo, a neurosurgeon, who last saw Square before the accident at issue on December 15, 1999. He planned to release Square to full-duty work if she kept progressing. Dr. de Araujo received a call from Square on January 7, 2000, informing him of her recent accident. Square was concerned because she had a strain in her

1

neck muscles where she had surgery a few months before. On February 2, Square complained of lower back pain.

While Square's neck strain resolved with no further problems, an MRI on February 8, 2000, indicated a small central disc herniation at L5-S1. Dr. de Araujo advised her to continue physical therapy and also referred her to Dr. Joseph Gillespie, an anesthesiologist who provides chronic pain management.

Square began treatment with Cheryle Troxclair, a physical therapist, on January 20, 2000. On January 21, Square was reporting pain at her sacrum. By February 4, the low back pain had worsened and was radiating into the right lower extremity to the foot.

Dr. Gillespie saw Square on March 30, 2000. He noted complaints of lower back pain, which was primarily right-sided with some bilateral foot and calf pain. He injected the S1 joint.

On April 1, 2000, Square was traveling out-of-town, when she lifted her forty-five pound son into the car. Square testified that her back gave out and she experienced excruciating pain. She went to Sherman, north of Dallas, and sought treatment in the Wilson N. Jones Medical Center emergency room. When she returned home, Square went to see Dr. Gillespie on April 4.

Dr. Gillespie noted increased left leg pain. He observed that there was a significant change from Square's previous visit. Dr. Gillespie saw Square one final time and attempted an epidural treatment.

Another MRI was performed on April 4, 2000. The MRI now indicated a large ventral and left paracentral disc herniation at L5-S1 with posterior displacement of the left S1 nerve root. Dr. Vidyadhar Akkaraju, a radiologist, testified that there were

2

no changes in the right-sided component of the disc. He also stated that there was no indication of a left-sided component on the earlier February 8 MRI. Although Dr. Akkaraju classified this as a progression from the first MRI, he did testify that something happened between February 8 and April 4.

Dr. de Araujo explained that it was common for a patient to have a herniated disc and expel another piece of cartilage through the same opening, so he also opined that this was progression of the herniation noted on the February 8 MRI.

There was also medical testimony from the defense that the herniation seen on the April 4 MRI was a separate event. Dr. Curtis Partington, a neuroradiologist, testified a tear in the disc will not go from one side to the other. He explained that if the herniation is going to enlarge from the previous tear, it will occur on the same side.

On June 13, 2000, Dr. de Araujo performed a lumbar microdiscectomy in which he removed a small part of the bone and released the nerve. Dr. de Araujo opined that Square would make a full recovery in due time. He released her to medium work. Dr. de Araujo saw Square on January 6, 2003, at which time he did not suspect instability of the spine and did not see an indication for a fusion from the MRI conducted at that time.

Square then went to see Dr. Louis Blanda, an orthopedic surgeon, on February 18, 2003. He noted symptoms of pain in the lower back and pain and numbness in the left leg. Dr. Blanda observed that there was past surgery, but he was of the opinion that the disc space had collapsed. He performed a disc fusion at L5-S1 and L4-5. Dr. Blanda testified that Square's pain was eliminated with this surgery.

3

Square filed suit on January 2, 2001, against LeBlanc and her employer, GJL Investment Company, and its insurer, Shelter Mutual Insurance Company. Prior to trial, it was stipulated that LeBlanc was at fault. Thereafter, trial was held on damages from December 8 to December 18, 2003. The jury returned a verdict finding that Square was injured as a result of the accident. It awarded her $10,000 for physical and mental pain and suffering and disability. Past medical expenses were awarded in the amount of $7,000, and lost past wages were awarded in the amount of $2,000. Square appealed the verdict.

## DAUBERT

Square challenges the testimony of two of the defense experts on appeal, that of Dr. Monroe Laborde, an orthopedic surgeon and biomedical engineer, and also that of Dr. Curtis Partington, a diagnostic neuroradiologist. Prior to trial, Square had filed a motion in limine concerning both Drs. Laborde's and Partington's video deposition testimony and, in the alternative, requested a hearing pursuant to *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993). Square's argument is that neither doctor's testimony was reliable to withstand a *Daubert* challenge.

Square challenged Dr. Laborde's ability to testify on the issue of whether Square's lumbar disc injury was caused by the accident because he had not examined Square, inspected either of the vehicles, or read the depositions of either Square or LeBlanc.

Square also argues that Dr. Laborde's testimony is unreliable because he relies on a report from another expert that the defense hired but never introduced into evidence. Dr. Martha Ketchum was a bio-mechanical/bio-medical engineer. She prepared a report indicating the delta velocity of the Square vehicle. After reviewing

4

Dr. Laborde's testimony, we find that his overall testimony was about the effects of low-impact accidents and the fact that no back injuries were reported in rear-end collision tests up to fourteen miles per hour. There was no reliance on a specific set of calculations regarding the speed or delta velocities of the vehicles. The overall effect of Dr. Laborde's testimony was that no back injury results from low-impact collisions.

In his video deposition testimony, Dr. Laborde testified about changes in velocity and the effect on the body. He authored a paper entitled *Biomechanics of Minor Automobile Accidents: Treatment Implications for Associated Chronic Spine Symptoms* which was published in the JOURNAL OF THE SOUTHERN ORTHOPAEDIC ASSOCIATION, Volume 9, Number 3, Fall 2000, at 187-92. The defense presented Dr. Laborde's testimony that in a study of about 3000 reported cases, no one has ever reported any low back symptoms in a rear-end collision up to fourteen miles per hour. He explained that the neck is the most likely area to be injured because there is less support in the vehicle for the neck than the rest of the spine. Dr. Laborde testified that neither Square's MRI nor biomedical engineering standards indicate a lumbar disc injury from the January 7, 2000 accident. The jury also heard evidence that Dr. Laborde did not examine Square and that it is not impossible to have an injury at low impact, although a low probability.

Square also sought to exclude the medical causation opinion of Dr. Partington because who likewise never examined Square or talked to her treating physicians. Dr. Partington also testified by video deposition and his observations were the same as most doctors. He testified that there was no evidence of left-sided problems on the February 8 MRI and the April 4 MRI indicated left-sided disc herniation which was

5

now compressing a nerve. He also agreed with Dr. de Araujo that the surgery in 2003 was not necessary because he could not identify an instability. The difference in Dr. Partington's opinion and that of the doctors offered by Square is his conclusion that the indications on the two MRI's are two separate and independent events rather than a progression of the original herniation. He admitted that he does not examine the patients.

A hearing on the motion in limine concerning the expert testimony was held on December 9, 2003. Concerning Dr. Laborde's testimony, the trial court denied the motion finding that Dr. Laborde could give a "qualified conclusion, but not unqualified. It'd have to be qualified based on the fact that he did not see the patient or the vehicle." Regarding Dr. Partington's testimony, the trial court also denied the motion stating, "It's going to be the same thing as what my conclusion was on Dr. Monroe Laborde. He cannot give an unqualified opinion about this accident cause injury because he did not see this patient."

The Supreme Court in *Daubert*, 113 S.Ct. 2786, examined the impact of the adoption of Fed.R. Evid. 702 on the "general acceptance" test for determining the admissibility of novel scientific evidence at trial established by *Frye v. United States*, 293 F. 1013 (1923). The court found that *Frye* was superceded by Article 702. Louisiana Code of Evidence Article 702 follows the Federal Rule of Evidence Article 702.

Later, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 1176 (1999), the Supreme Court explained the purpose of *Daubert* as follows:

> The objective of that [*Daubert's* gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of

6

intellectual rigor that characterizes the practice of an expert in the relevant field. Nor do we deny that, as stated in *Daubert*, the particular questions that it mentioned will often be appropriate for use in determining the reliability of challenged expert testimony. Rather, we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.

In the present case, Square has not questioned the scientific basis or expertise of Drs. Laborde's and Partington's opinions. She merely questions which information the doctors utilized in coming to their conclusions. The testimony is no different than their own expert Dr. Vidyadhar Akkaraju, a radiologist with a subspecialty in neuroradiology, who never examined Square but testified that the herniation he saw in the MRI from April 2000 was a progression from the herniation seen in the February 2000 MRI.

The fact that the doctors neither examined Square nor the vehicles, or read the parties' depositions, or reviewed all the medical records goes to the weight and credibility of each doctor's testimony, not its admissibility, "and it is up to the opposing party to examine the factual basis of the opinion in cross-examination." *Rowe v. State Farm Mut. Auto. Ins.*, 95-669, p. 17 (La.App. 3 Cir. 3/6/96), 670 So.2d 718, 728, *writ denied*, 96-824 (La. 5/17/96), 673 So.2d 611 (citing *Loudermill v. Dow Chemical Co.*, 863 F.2d 566 (8th Cir.1988)). *See also Ayres v. Beauregard Elec. Co-op, Inc.*, 94-811 (La.App. 3 Cir. 9/6/95), 663 So.2d 127, *writs denied,* 95-2432, 95-2434 (La. 12/15/95), 664 So.2d 455.

Square also argues that the testimony of Drs. Laborde and Partington were cumulative with the testimony of Dr. Randall Lea, an orthopedic surgeon who examined Square on August 29, 2002. Each of these expert witnesses offered by the

7

defense had different qualifications and could offer a little more insight into the case from their perspective.

For these reasons we find that the trial court was not required to conduct a *Daubert* hearing in the case. We also find that the trial court properly admitted the testimony of Drs. Laborde and Partington.

## EXCESSIVE AND HARASSING OBJECTIONS

Square claims that the numerous objections lodge by defense counsel during the course of the eight-day trial violated the parameters of La.Code Civ.P. art. 371 which provides, in pertinent part:

> An attorney at law is an officer of the court. He shall conduct himself at all times with decorum, and in a manner consistent with the dignity and authority of the court and the role which he himself should play in the administration of justice.
>
> He shall treat the court, its officers, jurors, witnesses, opposing party, and opposing counsel with due respect; shall not interrupt opposing counsel, or otherwise interfere with or impede the orderly dispatch of judicial business by the court; shall not knowingly encourage or produce false evidence; and shall not knowingly make any misrepresentation, or otherwise impose upon or deceive the court.

Square contends that the trial court's failure to control defense counsel's conduct was an abuse of its discretion to conduct orderly proceedings pursuant to La.Code Civ.P. art. 1631.

Reviewing the record, we observe that counsel for Square also made numerous objections during the course of trial, in addition to several requests for mistrials and sidebars. Both sides had objections that were sustained, and both sides had objections that were overruled. Our review of the proceedings does not indicate that one side over the other was prejudiced by opposing counsel's conduct. We find no merit to this argument.

8

## REDIRECT EXAMINATION

In brief Square states that the trial court prevented her from conducting redirect examination of several witnesses by granting the defense's objections to the alleged repetitive nature of the redirect questions posed by her counsel. Square contends this was an abuse of the trial court's discretion.

Louisiana Code of Evidence Article 611(D) provides for the redirect examination of a witness as follows:

> **Scope of redirect examination; recross examination.** A witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case. When the court has allowed a party to bring out new matter on redirect, the other parties shall be provided an opportunity to recross on such matters.

Furthermore, Comment (k) to Article 611, citing well-established jurisprudence, provides that the trial court has considerable discretion to allow or disallow the parties to conduct redirect examination. *Also see Brown v. Catalyst Recovery of Louisiana, Inc.*, 01-1370 (La.App. 3 Cir. 4/3/02), 813 So.2d 1156.

Many of the redirect questions posed by Square's counsel were repetitive of the direct questions and not true redirect examination. We also observed that several times the questions posed by Square's counsel concerned matters that were not matters that had been covered in cross-examination. Our review of the testimony reveals that Square's counsel was able to conduct a thorough direct and redirect examination of the witnesses. We find no merit to this argument.

## JURY INSTRUCTIONS

Square contends that jury charges on low-speed collisions and legal presumptions prejudiced, misled, or confused the jury. She asks that we reverse the jury's decision based on these jury instructions.

9

The trial court must give jury instructions that properly reflect the law applicable to the facts of the particular case. *Brown v. Diamond Shamrock, Inc.*, 95-1172 (La.App. 3 Cir. 3/20/96); 671 So.2d 1049. To fulfill this duty, the trial court must both insure that the jury considers the correct law and, in giving the instructions, avoid confusing the jury. *Id*.

*Mathews v. Dousay*, 96-858, p. 8 (La.App. 3 Cir. 1/15/97), 689 So.2d 503, 509.

In further elaborating on the duty of the courts in evaluating jury instructions, this court in *Mathews*, 689 So.2d at 509-10 quoted from *Iorio v. Grossie*, 94-846, pp. 2-3 (La.App. 3 Cir. 10/4/95), 663 So.2d 366, 368-69(citations omitted)(alteration in original)*:*

A trial court should give all requested instructions that correctly state the law, provided that they are material and relevant to the litigation. Courts are not obligated to give the specific jury instructions submitted by the parties, but omission of a requested instruction containing an essential legal principal [sic] may constitute reversible error. A court has fulfilled its duty if its instructions fairly and reasonably point out the issues presented by the pleadings and evidence and provide the principles of law necessary to resolve those issues.

An appellate court must exercise great restraint before overturning a jury verdict on the basis of erroneous instructions. Consequently, we will overturn the jury's verdict in the case *sub judice* on the basis of such an error only if the instructions, taken as a whole, were so incorrect or inadequate as to preclude the jury from reaching a verdict based on the relevant law and facts. Ultimately, the pertinent inquiry is whether the jury was misled to such an extent as to be prevented from doing justice.

Square contends that trial court's jury charge on low speed collisions was incomplete. The trial court charged the jury that, "While the force of a collision may be considered in determining whether a person was injured in an accident and the extent of any injuries sustained, it should not be the only fact to consider when making such a determination."

10

Square also complains about the trial court's jury charge regarding "presumption" wherein the trial court charged the jury that (emphasis supplied):

Plaintiff is aided in proving the causal relationship between the accident and her injuries by the legal presumption that a claimant's injury is presumed to have resulted from the accident, if before the accident the injured person was in good health, but *commencing with the accident* the symptoms of the injury appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable probability of causal connection between the accident and the injury.

Square's concern with this particular jury instruction was that the words "commencing with the accident" was used as opposed to "shortly after the accident." Square recognizes that the distinction is subtle, but claims that the jury could have believed that she was not entitled to a presumption of causation unless her low back injuries commenced on the date of the accident.

We find that these instructions given by the trial court adequately reflect the law and conveyed the issues to the jury without misleading it. *See Housely v. Cerise*, 579 So.2d 973 (La.1991) and *Brown v. Trinity Universal Ins. Co.*, 01-1405 (La.App. 3 Cir. 4/3/02), 814 So.2d 747, *writ denied*, 02-1689 (La. 10/14/02), 827 So.2d 422. Therefore, we find no merit to this argument.

## DAMAGES

Square claims that the awards by the jury for general damages, medical expenses, and lost wages are unsupported by the evidence presented at trial. As previously stated, the jury awarded $10,000 in general damages, $7,000 for past medical expenses, and $2,000 for lost wages. Square argues that she suffered an injury to the L5-S1 disc in her lower back which ultimately required two surgeries necessitating an increase in these awards.

11

Square has initially argued the previous legal errors as discussed required a *de novo* review. Finding no merit to these arguments we now review the award of general damages pursuant to the abuse of discretion standard and the awards of special damages pursuant to the manifest error standard, examining the facts or circumstances of the case under the circumstances to determine the adequacy or inadequacy of the award. *Thibeaux v. Trotter*, 04-482 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31.

"A tortfeasor is only liable for damages caused by his negligence, not from separate, independent, or intervening causes of damage, and it is the plaintiff who has the burden of proving that his injuries are in fact attributable to defendants." *Doucet v. Doug Ashy Bldg. Materials, Inc.*, 95-1159, p.5 (La.App. 3 Cir. 4/3/96), 671 So.2d 1148, 1152.

The jury found that Square was injured in this accident. However, the amount of damages awarded by the jury are a further indication that, although the jury felt Square was injured in this accident, any resulting surgeries, loss of wages, and future damages were the result of lifting her child and not related to this accident. We cannot say the jury abused its discretion or committed manifest error in its award of damages for this accident. After reviewing the facts and medical evidence in this case we find no error in the jury's finding that the left-sided herniation indicated on the April 4, 2000 MRI was not a result of this accident. It has not been disputed that Square picked up her forty-five pound child in early April and experienced excruciating pain. There was a definite change between the MRI after the accident and the MRI following the child-lifting incident. Therefore, we find no abuse of

12

discretion in the jury's award of general damages nor manifest error in the jury's award of special damages.

For the reasons set forth in this opinion, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Janis Square.

**AFFIRMED.**